May it please the Court, it's good to be back talking about this case again, this time under a different standard of review.   Well, Your Honor, I think you know the answer to that question. So what we're talking about today is an invention of the first drug that was ever approved for once-monthly dosing to treat any disease. Of course, the patents covering that dosing regimen were found obvious in two summary judgment postings. The issues that I'd like to talk about today, focusing on drug-by-standard review, is whether the appellees in this case had established a record in the district court showing that there were no contested issues of fact that are material to the district court's determination of obviousness. And in particular, I'd like to focus on whether there would have been a reasonable expectation of succeeding with a once-monthly dosing regimen. Let me ask you a procedural question, which I think I know the answer to, but I want to be sure. If this case were to go back, it would be a bench trial, correct? Yes, Your Honor. One of the appellees in the case had requested a jury trial. After denial of preliminary injunction, where several of the appellees launched at risk and started to cause damage to Roche, we informed the district court that we want to seek our damages in a trial and that we, in fact, wanted a jury trial. So there are damages at issue in the case now? There will be, if you send it back, because several of the appellees launched at risk with generic products that infringed the patents. And you would have to amend your complaint, presumably, to include those claims? If you send it back down, yes. But as the case now stands, it would not be jury trial on the basis of the first complaint? On the basis of the first complaint, I believe that's correct. We would need to amend the complaint. I did point out that one of the appellees requested a jury trial, and we haven't resolved the issue of whether or not you can have a jury trial in a straight Hatch-Waxman case. That's where I was going. So, to get back to the issues at hand in this case. So, the district court, at pages 814 and 834 of the first summary judgment opinion, entered findings concerning the total dose concept, based on interpretation of a prior article reached. As we pointed out, the district court cites nothing in the record in support of its interpretation of that prior reference. It states at 814 that it was relying on an observation by defendants, which we interpret as reliance on defendant argument. But, Mr. Waddell, you know that we review decisions, not opinions. And you've got this total dose concept, and you've got, you know, 2.5 milligrams and 5 milligrams in 30 days, and you've got prior art that exceeds 150 milligrams, and eureka, it works. So, why wasn't the invention obvious? So, there's an assumption underlying your question, Your Honor, and that is that one skilled in the art would have simply multiplied a daily dose times 30 and reasonably expected it to succeed. And our expert, Dr. Bill Ezekian, testified... So, let me answer that question. I was going to cite Dr. Bill Ezekian's testimony at A8374-75, where he says it wasn't that simple to simply multiply doses in this way or expect the results to work. What's underlying Your Honor's question about obvious to try is, are there a finite number of predictable solutions? And that's the very issue in the case, was the result of taking a one-month supply of drug all on one day a predictable solution to the problem? And that's where Rocha's expert testimony says, no, it wasn't, for several different reasons. So, the question is, did the court overlook evidence creating contested issues of fact on that very point that require a vacating remand? Does that answer your question, Your Honor? Yes. Thank you. So, what we had in the prior art, since you pointed to the 2.5 mg and 5 mg dosing study in Rabin, we had a finding by the district court that both doses were found to have positive results. That's a disputed issue of fact. Rocha's experts said that the 5 mg dose did not have positive results because, as the dose finding study in Rabin concluded, the dose response peaked at 2.5 mg, going up to 5 mg in dose did not further increase efficacy. That was reconfirmed by Rabin in a paper in 2002 that we also cited to the district court. But, did 5 mg give positive results? That's another way of saying that it was roughly equally effective, which is a positive result for the 2.5 and the 5. If I recall, that was Rabin's conclusion, right? Rabin's conclusion was that the 2.5 and 5 had similar efficacy for so-called markers and surrogate markers. The surrogate markers being the BMD, right? BMD and the indicators of anti-resorption. But, why wasn't 5 a positive result? Because Rabin also observed that the GI, gastrointestinal side effects, were higher with the 5 mg dose. But, if I recall correctly, not significantly, these weren't serious side effects. That's incorrect, Your Honor. Our experts, both Dr. Dyfotis and Dr. Bilodezikian, observed that the side effects were severe enough to cause double the number of patients drop out of the study. Well, here's what Rabin says. None of these adverse events were considered serious. That was what I was attempting to quote. I think that you're focusing on the toxicity of the drug rather than the convenience of the drug. Remember that the effort in this area of art was to have post-menopausal women take continuous chronic therapy so that they would get protection against fractures. And what Rabin found with the 5 mg dose was that it didn't give a better effect and it caused higher the number of dropouts from the study. Meaning the patients in the clinical study didn't like taking the drug, didn't tolerate those side effects. Even though they weren't severe, they were inconvenient. But in your brief, you say Rabin's data established that the daily 2.5 dose was more effective than the 5 mg. That doesn't quite match what you're telling us now. Well, correct. I think what Judge Bryson was quoting was from Rabin 1996, but in the conclusion at the end of that article, it said 2.5 mg provided the maximal effect. Rabin also in 2002, in the conclusion, stated that the 2.5 mg provided maximal efficacy and at the lowest effective dose. So when you say more effective, you're considering the side effects in the overall determination of effectiveness? Well, correct. Because if you can't get a patient to stay on drug, then you can't treat them with the drug. I mean, that's just the basic premise. And what the ART was focused on in this case, and this is undisputed, was that patients needed chronic therapy in order to have protection against fractures. Without being treated, 35% of post-menopausal women will have back fractures or hip fractures. But the problem with that argument seems to be that it was already known and suggested that that non-daily therapy, weekly or biweekly, could be effective. It was a hypothesis that it might be effective, Your Honor. Was that all hypothesis? Were there no tests? There were four tests. These were cited by our expert reports. There were two trials of intermittent dosing to lutronate and abandronate at four different doses. All of them failed. Dr. Bilizikian explained this to the district court at the preliminary injunction hearing at A34-101. He talked about the failure of the Roche IV trial, and also in his expert declaration. The RECR trial, but the RECR abstract doesn't give the results. The RECR abstract that was in the ART, it said the results would be presented at a meeting in June 2000. The first publication talking about the RECR results is the Schnitzer 2001 reference, which said it failed. Because it's anti-fracture, it isn't DMD, correct? Correct. But osteoporosis is the word used in the claims. And the definition of osteoporosis is it's a disease that results in not only decreased bone density, but also there's damage to the bone that leads to increased risk of fracture. The issue with that Roche IV trial and RECR, as discussed in Schnitzer, was it did increase bone density, but it didn't have an effect on reducing fracture. It was a failure. The FDA record at A802-1... Not a statistically significant reduction, I think, was the conclusion, correct? If I recall correctly, there was a 25% reduction in the actual numbers of fractures, but it was decided because the N was small that that wasn't significantly significant. So no real conclusion can be drawn from RECR, I take it. Well, I think that's the point of the study, is that in order to conduct clinical testing on human beings, you have to define the parameters that define success. And in order to test this dose, even at the N numbers they used, they had to have 3,000 women in that study for three years. So our experts, as we cited in our brief, all talked about the fact that that was a failure. If you don't demonstrate an effect beyond mere chance, you haven't demonstrated that the drug works. I'll also point out, Your Honor, at A802-1 of the FDA record, the FDA indicates that that trial was terminated prematurely due to lack of efficacy. Meaning the results were so bad, they wouldn't complete the study, because they were just subjecting patients to fracture risk with no benefit. Could I ask you to comment, to return momentarily to the safety issue? Could you comment on Muckel's statement that no significant side effects were observed in clinical studies using ibondronate at even high dosages, and those high dosages were, in Muckel, about 250 milligrams, and also the brief conclusion that there were no, or the same side effects from 20 milligrams every other day as from 2.5? I'll comment on that. I'm down to two and a half minutes. I'm into my rebuttal time. Never mind. We'll save your rebuttal time. Please answer the question. Thank you. So, in the case of Muckel, Muckel described film-coated tablets up to 250 milligrams. The claims were limited during prosecution to a maximum of 100 milligrams. The statements in Muckel did not refer to specific clinical trials, and all of the experts in the case testified they were unaware of any testing of that drug published in the literature. At doses above 20 milligrams in postmenopausal osteoporosis patients, which was in Reese, 50 milligrams in the Coleman cancer study, and there was a very preliminary test of 100 milligrams, single dose, in normal young healthy male volunteers. The issue, again, if you go back to the tolerability issue, is can you get postmenopausal osteoporosis patients, which would be women typically in their 70s, to find the drug tolerable enough at the dose you're administering so that they'll stay on medication. If they stop taking the medication, they're not protected against fracture risk. And that's the objective of treating osteoporosis. Did I answer your question? With respect to Muckel, yes. Thank you. Okay. Thank you, Ms. Wardell. It's time for a rebuttal. We'll hear from Ms. Mazzocchi. The district court judgment should be affirmed here, because the claims are very simple. Oral once-monthly dosing of Evandronate, 150 milligrams. Oral once-monthly dosing of Evandronate was already known and taught in the prior art. So the only question the person of ordinary skill was going to confront is what amount to dose. We're told that this is the first once-a-month dose ever approved by the FDA. So how could it have been obvious to have a once-a-month dose? I don't think that the standard for obviousness is who managed to get FDA approval first. That wasn't my question. Sure. But the fact of the matter is that it was already taught in the prior art, oral Evandronate once-a-month dosing. So Roche held the patent to Evandronate that covered all uses of Evandronate, and that didn't expire until 2012. So very similar to what occurred in the Merck v. Teva case, the person of ordinary skill in the art was blocked by Roche's other patent from actually doing that experimental work. Our understanding is that the Hatch-Waxman Act permits experimental work without infringement. But that doesn't necessarily mean that a party could have gone forward to commercialize the product because it was still covered by Roche's patent all the way through 2012. So would you answer the question I asked you? Right. So you said, why didn't somebody else commercialize? No, I said, why didn't someone else make the discovery? Someone did make the discovery. It was reported in the prior art. 150 milligrams for 30 days? Tested? Effective? Could you give us the citation for that? The Krauss reference that we cited in our brief expressly stated that Roche and GSK had signed a pact to commercialize an oral once a month Advantronate formulation. We don't dispute that the actual number of the dose amount of 150 milligrams is not listed in that Krauss paper, and that's why this is an obviousness analysis and not an anticipation analysis. But the fact of the matter remains is that selecting a dose is something that their experts and the prior art both recognized is something that was a matter of routine skill for the person of ordinary skill in the art. The Dicodus 932 patent expressly said this is something that the person of ordinary skill in the art can do and is routine, and their own expert admitted that once you have identified the drug you want to use and selected the dose interval, once you make the invention that Roche made and proceed and it works, then it becomes obvious. No, because what the obviousness legal test is would the person of ordinary skill in the art have a reasonable expectation of success? So if you look, for example, at Krauss or Lunar News, both of which suggested make an oral once a month, abandon a dose, the obviousness question then becomes, would it be reasonable for the person of ordinary skill in the art or routine for the person of ordinary skill in the art to actually pick the dose? Didn't the district court err in stating that the issue of anti-fracture efficacy was not material to the obviousness inquiry? Is that unexpected activity? No, he did not, actually. For multiple reasons. First, there's no requirement, there's no threshold requirement of achieving anti-fracture efficacy in the claims. Under Roche's infringement analysis, for example, they took the position that if any one woman takes one single 150 milligram dose, they're infringing the claims. You're not going to achieve anti-fracture efficacy with just that single one dose. But nevertheless, that's the same type of activity that they would say infringes, even though that particular woman doesn't achieve anti-fracture efficacy. In fact, Mr. Waddell just acknowledged that maybe only about 30 odd percent of women are actually going to potentially experience an anti-fracture risk reduction benefit. So I think the district court was correct in not saying that with anti-fracture efficacy not a part of the claims, that you don't need to have that proof in the prior art, again, for reasonable expectation of success. And I think that what the district court also relied on was the admission by their own expert that bone mineral density, which is one of the test markers that was used in the Reese paper discussing the total dose concept. He said bone mineral density is one of the most powerful surrogate markers we have in medicine today, in the context of this field of drugs. So when the Reese paper points out that under the total dose concept, you can hit the same bone mineral density improvement target, whether you're dosing it daily or whether you're dosing it over this much longer interval, the district court was absolutely correct to say that's all the person of ordinary skill in the art needs to have a reasonable expectation of success. Likewise, let's not forget, Roche has never tested the 150 mg dose in an anti-fracture efficacy study. All Roche did is they did a BMD, bone mineral density test, to correlate it. And also, if I may, let me give the court an additional citation to one of Roche's experts. This is at A8431, Harris transcript 304 lines 8-15. Within any given bisphosphonate compound, I think that one of ordinary skill would argue that a bigger bone mineral density change is likely to provide better fracture protection than a smaller change. So it was recognized by those in the art that if you could have an improvement in bone mineral density, it was reasonable to expect that would lead to better anti-fracture efficacy. So I think the district court was absolutely correct in finding that Roche's anti-fracture efficacy theory was really not material to the legal test, which is, is there a reasonable expectation of success? With regard to... The court declined to consider the non-linearity of the dose response curve. Is that correct? Well, the district court did consider it in one of the opinions below, and again found that it was not going to be material to the outcome, and here's why. Roche's relied on the non-linear... This was in the reconsideration opinion? Roche's relied on the non-linearity dosing thing in two ways. Their first theory is that it somehow would dissuade the person of ordinary skill in the art from following the total dose concept. But the problem is that it can't serve as a teaching away because as they admitted throughout their brief, and that's at pages 8, 54, 59, 64, 66, 67, and 71, they admitted the person of ordinary skill in the art wouldn't have known that a Bandrenate had non-linear bioavailability. So if the person of ordinary skill in the art wouldn't have known about it, it can't teach away from applying the total dose concept. Now the other argument that Roche's... Well, for the way in which Roche is trying to use that data on teaching away, because what the person of ordinary skill in the art... I'm saying that Roche's suggestion that non-linear bioavailability somehow would have taken the person of ordinary skill in the art away from the total dose concept can't work because if you want to have a teaching away, it has to actually be in the prior art. If it's not in the prior art, it can't teach away from anything because it's not known. Now the other way they've tried to use non-linear bioavailability is to just say, here, before this court, they're trying to say it's a secondary consideration, it's an unexpected result, but in the 957 summary judgment briefing, and this is at A12234, they specifically said, quote, Roche is not arguing that non-linear drug absorption is per se an unexpected result. So having made that representation to the district court, I don't think it's appropriate for them to raise or suggest for the first time here that it should count as some sort of independent, stand-alone, unexpected result. So you're saying that that information just should not be considered, despite all of the cases that say that you have to consider the entirety of the evidence? Oh, well, the district court considered it, but he found it immaterial and irrelevant because it can't change the ultimate outcome. And I think that if we look at some of this court's cases, including in the pharmaceutical context, such as McNeil v. Upjohn, McNeil v. Perrigo, there have been many instances even where there has been evidence of secondary considerations that was undisputed, certainly stronger evidence of commercial success as compared to the type that we had here. And the court said that when there is nevertheless a strong reason or motivation to prepare whatever it is that's claimed, then that's not going to outweigh obviousness. Certainly secondary considerations should be considered, but as this court said in the Bayer v. Watson case we cite in our brief, the fact that you may try to put forth some evidence of secondary considerations doesn't mean it's going to change the ultimate outcome. And I think that was actually one of the... But how can you predict the ultimate outcome? We're told that no drug has ever been approved before this for once a month doses. We know just as common knowledge, if there's a drug, a medicine out there that you take once a day like aspirin. So you take 30 all at once. Isn't that how people commit suicide? I mean, why is it so obvious that this would be tolerable and effective? Because we have the Reese publication saying that for the bisphosphonate field, I think both their people and ours said that Reese was a game-changing publication. He said that five milligrams is less desirable than two and a half. The Robin paper is the one that tested the daily doses. The Reese paper, which came out later, is the one that does patients with 2.5 milligrams a day and then does the patients with much larger versions of the doses and then let the patients not take the drug for the rest of a two-month interval. And what Reese reported is that when you look at the bone mineral density results with the 2.5 daily dose versus the longer nine-week-off interval dose, those patients wound up in the same place in terms of their bone mineral density. The very powerful surrogate marker that their own experts agree is the strongest predictor of anti-fracture efficacy. So with that teaching for this field, and because the bisphosphonates, the way in which they work is they get into the bone, they accumulate there over time, and because bone turnover is a much slower process, then the drug is there to actually do its work and slowly over time build up the bone mineral density. That's why Reese was a very important paper in this field, because it did give that assurance that now you can go for these longer doses. And I think it's very telling to see what did wind up happening in the prior ART Schofield reference. They started mentioning, now you can do equivalent doses including once monthly. The Gettys publication, the Chen reference, all of them started saying you can do monthly and even longer interval doses. There are bisphosphonates in the field, the lendronate, where it's actually dosed once a year because the drug is so powerful and it powerfully binds to bone. But I think that one other thing to consider, Your Honor, is that to the extent Roche is trying to imply that there might have been some long felt need for the once monthly dosing, the fact of the matter is, and it's not disputed, that from a commercial success standpoint, once monthly didn't actually take the market by storm. It actually didn't displace the once weekly dosing. So while it was out there, it was proposed, it was suggested, in reality there were lots of other people who applied this once a month concept. And the fact that Roche managed to get approval from FDA first, I really don't think that that... You're saying there are lots of other people who have been using medicines once a month? I heard you just say that. In this field. In fact, risedronate, which was also known in the prior art, it's disclosed in Schofield as a potent aminobisphosphate drug, that's also on the market as an oral once a month dose with a 150 milligram dose. And they applied the same total dose concept to get to that dose that Roche did here with abandronate. And that's in the prior art Schofield patent teaching. That's one of the things that they pointed out. They said if we're going to look at the preferred doses for these types of bisphosphonates, they had the narrow range and then they went to a more preferred range of the 5 and 10 milligram doses. And Roche complains about the Schofield reference, oh, but that doesn't expressly say abandronate. But it shows that the principle was being applied to other bisphosphonates and the person of ordinary skill in the art would likewise be able to see that information. And Judge Chesler in fact noted that the Schofield publication also taught the application of the total dose concept. And Roche has not shown any error in that undisputed material fact. So when you get down to it, what are the undisputed material facts here? It's undisputed that several prior art references expressly said oral once monthly dosing of abandronate. It's undisputed that Reese taught the total dose concept. And it's undisputed that Robin had two doses that worked, 2.5 and 5 daily doses. And when you plug those numbers into the total dose concept, you reach a 75 milligram and a 150 milligram dose. That's a limited number of options and the district court thus correctly concluded that for all of the other things that Roche tried to raise, they didn't change those undisputed facts and their so-called secondary considerations of this didn't really sway how you actually would calculate the dose. So if there's nothing different about how you would calculate the dose, then yes, it's obvious. Can I ask one more question briefly just to follow up on a question that I asked opposing counsel? Could you address the question of safety and by that I mean to incorporate not simply non-toxicity but also inconvenience and effects. And let me put the question to you this way. What is the best prior art you have that demonstrates that a person of skill in the art would not be dissuaded because of safety reasons from the claims invention? Sure. I would rely on the Munkle patent, which the patent specifications here themselves relied on as the written description support. And that's 250 milligrams? That's 250 milligrams. Further, the Difodus-9-3. Explicitly said no significant side effects? Well, it basically said that the problem that we see with these larger doses is that you have some of these GI effects and the GI reflux. And if you put this film coat on it and we get it into the stomach so that we concentrate the release occurring further down in the stomach, then you're going to be okay. And that was the only assurance that Roche gave in their own specification for safety. So under Merck v. Teva, just as their specification doesn't give any safety assurances, this court said it would be error to try to rely on that as a point of distinction versus the prior art. But I would also cite the Difodus-9-3-2 patent, which also, while it didn't include clinical trial data, nevertheless talked about Evandrinate doses as high as 200 milligrams, and that was including for weekly dosing. Does that answer the question? That does answer the question. Thank you. Okay, thank you. Mr. Waddell. Resentinate was developed as a monthly after Roche proved it could be done. Dr. Gamble licensed the claims 9 and 10 of the 634 patent here in suit in order to do so. Roche was the first to prove this could be done. Well, you know, on that, it may be the first time it was done, but I was impressed with Mr. Harris' statement. He's your witness, I guess, your expert. He says as of May 6, 2002, he says yes to the question, would a person of ordinary skill in the art have had a reason to evaluate oral monthly Evandrinate? So it seems that that is sort of out of the picture, isn't it? Aren't we really only talking about dosage? I don't think so, Your Honor, because we're still dealing with the issue of whether there was a reasonable expectation of success. Dr. Harris participated in most of the clinical trials in this area, and as he testified, most of the clinical trials in this area were failures. In fact, all of the clinical trials of intermittent dosing had failed before this point. So yes, it was an interesting concept to try to make work, but no, there was not a reasonable expectation that it was going to happen. I think that you might find some helpful testimony from Dr. Harris, to my point, at A8422. There he testifies about dose-finding studies, and he says that we had to use surrogate markers to do them, but they didn't tell us whether we were really going to succeed or not. He said most of the trials aimed at proving therapeutic efficacy, anti-fracture efficacy, as he put it on that page, went down in flames. So it was a very unpredictable art. If you don't accept the notion that BMD is a very strong, powerful surrogate for efficacy in this area. Well, Dr. Billazekian addressed that. This is at page A20056. What he explained is that after Roche attempted an intermittent dosing trial, a fracture trial with Evangernate, it raised BMD, but it failed to reduce fracture.  He says that this changed after this failure, which is recorded in the Schnitzer paper. This caused people in the art to focus on, gee, do we need to continuously suppress abnormal bone resorption in order to get fracture protection? If you're interested in this issue, I'd also recommend Hochberg at A9777. The first paragraph of Hochberg explains that in osteoporosis, as the abnormal bone resorption destroys bone, of course, bone density goes down. That's why it's diagnostic of the disease. But in order to treat the disease, you not only have to raise bone density back up, you have to fix the broken structure. Think of a bridge where the beams have rusted away. You could weld new steel on the beams, but if you don't restore the connectivity of the structure, it's not going to hold up. And that's what was unknown in treating fracture with these drugs. And what Dr. Harris talked about at A422, we have these surrogate markers that we can use to try and find doses that we can then use in these 3,000 patient multi-year studies. But they mostly failed. And in intermittent dosing, all of the attempts to bring drugs to market failed, which we think is relevant evidence that should have been considered. With regard to infringement, there was a misstatement by my friend. I did not say only 35% of women infringe. What I said is that if untreated, 35% of women will suffer a broken back or a broken hip in their lifetime if they suffer from osteoporosis. The aim of treatment is to treat all women who are susceptible to the disease, give them chronic treatment, and give them protection against that potential life-changing event. I didn't have time to discuss the unexpected results in this case. Of course, that's a very complex issue, but it's also fully covered in the briefs. If you had any questions about that, I'd be happy to answer them. Well, we'll digest it from the briefs. Thank you, Your Honor. Okay. Thank you. Thank you both. The case is taken under submission.